Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
**SWIGART LAW GROUP, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA  92108
P: 866-219-3343
F: 866-219-8344

Daniel G. Shay (SBN 250548)
DanielShay@TCPAFDCPA.com
**LAW OFFICE OF DANIEL G. SHAY**
2221 Camino del Rio S, Ste 308
San Diego, CA  92108
P: 619-222-7429
F: 866-431-3292

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case No.:  **'19 CV 2377 WQH MSB**

JOHN AGANON,

            Plaintiff,

vs.

FREEDOM DEBT RELIEF, LLC, ANDREW HOUSSER, FINXERA, INC. & NATIONAL LITIGATION LAW GROUP, LLP,

            Defendants.

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:

  I.   CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679, ET SEQ.
 II.   ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. § 1693, ET SEQ.
III.   CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, ET SEQ.
 IV.   THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, CAL. CIV. CODE § 1788, ET SEQ.
  V.   NEGLIGENT MISREPRESENTATION
 VI.   INTENTIONAL MISREPRESENTATION
VII.   NEGLIGENCE
VIII.  CONVERSION
 IX.   TRESPASS TO CHATTELS

Complaint                                    1

**BACKGROUND**

1. On July 9, 2019, the Consumer Financial Protection Bureau obtained a $25 million judgment against Freedom Debt Relief, LLC ("Freedom") and its founder Andrew Housser.  The illegal acts that are the subject of that judgment are substantially similar to those alleged herein.

2. This is an individual action brought by John Aganon ("Plaintiff") that purchased regulated debt management, financial and legal services from Freedom Debt Relief, LLC ("Freedom"), Andrew Housser ("Housser") Finxera, Inc. ("Finxera") and National Litigation Law Group, LLP ("NLLG") ("Defendants").  Plaintiff, by and through his attorneys, brings this action to challenge Defendants' unfair business practices and conduct which caused Plaintiff damages.

3. In enacting the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.* ("CROA"), Congress declared that "certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters." 15 U.S.C. § 1679(a)(2).

4. The purposes of the CROA are (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b)(1); 15 U.S.C. § 1679(b)(2).

5. The CROA prohibits a variety of false and misleading statements, and fraud, by credit repair organizations ("CROs"). CROs may not receive payment before any promised service is "fully performed." Services must be under written contract, which must include detailed descriptions of services and

contract performance time. Credit repair organizations must provide consumers with separate written disclosure statements describing the consumer's rights before entering into the contract. Consumers can sue to recover the greater of the amount paid or actual damages, punitive damages, costs, and attorney's fees for violations.

6.  In enacting the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA"), Congress found that the use of electronic systems to transfer funds provides the potential for substantial benefit to consumers.  Due to the unique characteristics of such systems, Congress passed the EFTA to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic funds transfer systems, most particularly, to provide consumers with individual rights.

7.  In enacting the California Business & Professions Code § 17200, *et seq.*("BPC"), the California legislature broadly restricted (1) unlawful business acts; (2) unfair business acts; (3) fraudulent business acts; (4) unfair, deceptive, untrue, or misleading advertising; or (5) any act prohibited by BPC § 17500-17577.5.  Section 17203 allows the court to order injunctions.

8.  In enacting the California Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*("RFDCPA"), the California legislature determined that the banking and credit system and grantors of credit to consumers are dependent upon the collection of just and owing debts and that unfair or deceptive collection practices undermine the public confidence that is essential to the continued functioning of the system and sound extensions of credit to consumers.  The Legislature has further determined that there is a need to ensure that debt collectors exercise this responsibility with fairness, honesty, and due regard for the debtor's rights and that debt collectors must be prohibited from engaging in unfair or deceptive acts or practices.[1]

---

[1] Cal. Civ. Code §§ 1788.1 (a)-(b)

### INTRODUCTION

9.  Plaintiff alleges that Defendants operate an elaborate scheme to prey on consumers that are drowning in credit card debt. Defendants target debtors, specifically those with larger debts, that are unable to make minimum payments or will soon be unable to make such payments.

10. Freedom claims to act as a legitimate debt settlement company that offers debt settlement services while attempting to avoid strict consumer protection regulations enacted to protect vulnerable and unknowing consumers.

11. Housser is the co-founder and co-CEO of Freedom. At all times material to this Complaint, Housser has exercised substantial control over and involvement in the establishment of Freedom's business policies and practices described in the Complaint. At all times material to this Complaint, Housser has had managerial responsibility for Freedom and has materially participated in the conduct of its affairs.  Housser and Freedom are so closely related that Plaintiff intends to pierce the corporate veil.

12. Finxera knowingly charges and processes unauthorized fees for itself, Freedom and National Litigation Law Group ("NLLG") while attempting to escape scrutiny associated with the highly regulated banking industry by claiming it simply operates Special Purpose Accounts, not bank accounts, so it is not subject to traditional banking regulations. The scheme alleged herein could never transpire if Plaintiff's settlement funds were held in a normal bank account.

13. Defendant NLLG was paid $12.00 a month for legal services, not originally approved by Plaintiff, like defending Plaintiff from lawsuits, that it never performed.  NLLG gave the scheme more legitimacy and provided answers to frequently asked questions like "what happens if I am sued".  Supposedly, NLLG would defend the suit, but in Plaintiff's case, it never did – even after actual notice of the suit.

14. Plaintiff alleges that Defendants violated: (i) the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.*; (ii) California Business & Professions Code § 17200, *et seq.*("BPC"); (iii) the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*; (iv) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*, and are also guilty of (v) negligent misrepresentation; (vi) intentional misrepresentation; (vii) negligence; (viii) conversion; and, (ix) trespass to chattels.

15. Plaintiff makes these allegations based on personal knowledge and investigation conducted by Plaintiff's attorneys.

16. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

17. Unless otherwise indicated, the use of any Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that defendant named.

## JURISDICTION AND VENUE

18. This action arises out of Defendants' violations of (i) the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.*; (ii) California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.*; (iii) the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*; (iv) the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code § 1788 *et seq.*; (v) negligent misrepresentation; (vi) intentional misrepresentation; (vii) negligence; (viii) conversion; and, (ix) trespass to chattels.

19. Jurisdiction of this Court arises over Plaintiff's claims under the Credit Repair Organizations Act, 15 U.S.C. § 1679, *et seq.*; and, the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.* pursuant to 28 U.S.C. § 1331, and pursuant to 28 U.S.C. § 1367 for supplemental state claims.

20. Because Defendants conduct business within the State of California, personal jurisdiction is established.

21. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in the County of San Diego, State of California which is within this judicial district; (ii) the conduct complained of herein occurred within this judicial district; (iii) the agreement entered into between Defendant and Plaintiff was executed in this county; and (iv) Defendant conducts business within this judicial district.

## PARTIES & DEFINITIONS

22. Plaintiff is a natural person that resides in the County of San Diego, State of California.

23. Plaintiff is also a person from whom a debt collector sought to collect a consumer debt which was alleged to be due and owing from Plaintiff and is a "debtor" as that term is defined by California Civil Code § 1788.2(h) and a "consumer" as that term is defined by 15 U.S.C. § 1693a(6).

24. Plaintiff and Defendants are all "persons" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17206 authorizes a private right of action on both an individual and representative basis.

25. At all times relevant, Defendants were "persons" as defined by Regulation E in 12 C.F.R. 1005.2(j) and used throughout the EFTA, 15 U.S.C. § 1693, *et seq*.

26. Defendants' products constitute "services" as defined pursuant to Civil Code Section 1761(b).

27. Freedom Debt Relief, LLC is a consumer-debt-settlement company. Established in 2002.  Freedom claims that it has successfully negotiated and settled consumer debts in excess of $10 billion for over 650,000 consumers who have enrolled in its debt-settlement program.  Freedom is a Delaware

limited liability company that conducts business in the State of California with its principal offices located at 1875 S. Grant St., Suite 400, San Mateo, CA 94402.  It is a "credit repair organization" as defined by 15 U.S.C. § 1679a(3)(A) providing credit repair services as defined by 15 U.S.C. § 1679b. Plaintiff is informed and believe, and thereon alleges, that Freedom, is a debt collection agency too.

28. Housser is an individual natural person that maintains control over Freedom. Upon information and belief, Housser may also have ownership interest in the other Defendants, or share profits with them, or is paid by them, receives some other benefit, or at a minimum has influence over them.

29. Finxera, Inc. is a California corporation with its principal place of business located in California.  Finxera is part of the emerging financial technology or "fintech" industry which includes things like on-line pay day loans and virtual accounts.  The industry has come under scrutiny from regulators for circumventing traditional banking regulations.

30. National Litigation Law Group, LLP is a law firm and a limited liability partnership organized in the District of Columbia with its principal place of business in Oklahoma.

31. Plaintiff is informed and believes, and thereon alleges, that Defendants, in the ordinary course of business, regularly, on behalf of themselves or others, engage in debt collection as that term is defined by California Civil Code § 1788.2(b), and are therefore "debt collectors" defined by California Civil Code § 1788.2(c) and 15 U.S.C. § 1692a(6).

32. This case involves money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction.  As such, this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by 15 U.S.C. § 1692a(5); and Cal. Civ. Code § 1788.2(f).

33. The term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers and transfers initiated by telephone, text or email.  *See* 15 U.S.C. § 1692a(7).

### FACTUAL ALLEGATIONS

34. Sometime prior to 2016, Plaintiff incurred certain financial obligations to several creditors that were money, property, or their equivalent, which are due or owing, or alleged to be due or owing, from a natural person to another person and were therefore "debts" as defined above.

35. At all relevant times, Defendants were in the business of providing debt reduction services to consumers, claiming to be an alternative to bankruptcy, credit counseling, or debt consolidation.  The business was marketed as a package including, debt settlement, advice on credit reporting, legal and financial services, and were all part of Defendants' scheme to bilk Plaintiff and thousands of other consumers.

### Freedom's Enrollment of Plaintiff

36. In 2016, Freedom instructed Plaintiff who had been making timely payments to his creditors to withhold any further payments and to change his billing address with his creditors to Freedom's Arizona address, 4940 South Wendler Drive, Tempe, AZ 85828.

37. Freedom coerced Plaintiff to enroll in its debt-settlement program even though he was not delinquent on any debts at the time of enrollment.  Freedom said it would claim financial hardship for Plaintiff as part of its underwriting efforts, regardless of Plaintiff's income.

38. Before Plaintiff enrolled in Freedom's program, Freedom pulled his credit

report.  Freedom used the credit report to confirm its telephone discussions with Plaintiff, the identities of his creditors, the amounts owed to each creditor, the nature of the debt owed to each creditor, and the payment status for each debt.

39.  Freedom's underwriting department prepared a "Schedule of Creditors and Debt" listing Plaintiff's creditors and the amounts owed to those creditors. The Schedule of Creditors and Debt was submitted to Plaintiff for review and execution, and it became "Exhibit A" of the Debt Resolution Agreement that Plaintiff entered into with Freedom for debt-settlement services.

### Freedom's Misrepresentations and Lack of Disclosure

40.  While Freedom's Debt Resolution Agreement explained that Plaintiff could withdraw from the program and terminate the agreement, it did not notify Plaintiff that if he withdrew from the program, he would receive the funds in his account, minus any fees that Defendants alleged they were owed.

41.  Freedom acts as a debt negotiator on behalf of consumers, advertising that it can help those who owe large amounts of unsecured debts, usually $10,000 or more, by negotiating their debts with creditors.

42.  On its website, Freedom directs consumers to speak with its sales representatives, which it deceptively refers to as "Certified Debt Consultants,"[2] despite these individuals holding no specialized certifications in debt management.  Defendants' Certified Debt Consultants are misrepresented as neutral providers of information, when in fact they are sales representatives who actively promote Defendants' program and hold no special certification other than employment with Freedom.

43.  Freedom claims the "Certified Debt Consultants" are "experts on your side" and part of a "team of highly trained debt professionals [that] are your partners every step of the way."  The Certified Debt Consultants allegedly

---

[2] https://www.freedomdebtrelief.com/why-were-better/  - last accessed on November 13, 2019

provide counseling and advice to consumers to help them determine which strategy is best saying "Consumers come first" claiming to do what is in the consumer's best interest. Freedom's website also claims that "Whether or not you enroll in our program, [we] do whatever [we] can to empower you to reach your financial goals."[3]

44. Consumers deciding whether to enroll in Freedom's program are assured that Freedom's program will reduce the consumer's debt ultimately resulting in a better credit score.

45. Freedom fails to inform consumers that negotiations with creditors do not commence until the consumer has missed many payments and has deposited sufficient funds into their Special Purpose Account operated by Finxera from which Freedom negotiates settlements and extracts its fees. Generally, sufficient funds will not accumulate until six to nine months after enrollment, at which time negotiations with creditors may begin, however settlements are not certain to begin immediately once sufficient funds have accumulated in the Special Purpose Account.

46. Freedom fails to inform consumers that it cannot guarantee creditors will negotiate rather than sue the consumer, while counseling consumers to engage in conduct that is virtually certain to result in negative reports on the consumer's credit score, credit history, or credit rating.

**Freedom's Knowledge That Certain Creditors Would Not Negotiate**

47. Freedom has long known that certain creditors have policies against negotiating with debt-settlement companies such as Freedom.

48. For example, in late 2011, KPIX-TV ("CBS 5"), a local San Francisco television station, aired a story about two Freedom customers who complained about Freedom's inability to settle debts they owed to Chase. Chase confirmed to CBS 5 that it "does not work with debt-settlement companies." So as early

---

[3] https://www.freedomdebtrelief.com/why-were-better/  - last accessed on November 13, 2019

as 2011, Freedom had notice and knew or should have known that some creditors would not negotiate as a matter of corporate policy.

49. Freedom has actively sought to reverse creditors' policies against negotiating with debt-settlement companies. For years, it has maintained a team dedicated to meeting with creditors that have frequently refused to negotiate with Freedom to persuade them to change their policies. On occasion, Housser accompanied this "creditor development team" on its meetings. And for years, Housser has received regular updates (typically every two weeks) from the "creditor development team" and has met frequently with the team to learn about its efforts to persuade creditors to negotiate with Freedom.

**Freedom's False Claims That All Creditors Would Negotiate**

50. Despite knowing that certain creditors would not negotiate with it, Freedom told Plaintiff that it could negotiate all of his debts.

51. Section Two of Freedom's Debt Resolution Agreement with Plaintiff represented that "each Creditor listed on Exhibit A will work with us to negotiate a settlement of your Debts." Exhibit A of the Debt Resolution Agreement, the "Schedule of Creditors and Debt," listed all debts that Plaintiff enrolled in Freedom's program and the creditors associated with those debts.

52. Freedom made this representation even though Plaintiff's Exhibit A included Synchrony Bank, known to Freedom to have a policy against working with Freedom.

**More Unlawful Business Practices**

53. In September of 2016, Freedom instructed Plaintiff to claim financial hardship with his creditors, no matter his financial situation, cease making monthly payments to them and begin making monthly deposits into Finxera's Special Purpose Account ("SPA").

54. Freedom had Plaintiff stop communicating with his creditors so it could communicate directly with them.

55. Freedom's certified debt consultants insisted that Plaintiff enroll all of his accounts in the program. Plaintiff was resistant because Plaintiff only required assistance for some accounts and not others. The agents indicated that the program would fail if Plaintiff did not enroll all of his accounts because creditors would not negotiate with Freedom if the creditors saw that certain accounts were being paid and in good-standing while others were not.

56. Eventually the agent's pressure resulted in Plaintiff agreeing to enroll all of his accounts in the program.

57. Due to Defendants' conduct described herein, this ultimately resulted in Plaintiff having many derogatory items on his credit reports.

58. On September 22, 2016, Freedom prepared a "Debt Resolution Agreement" for Plaintiff which showed that Plaintiff could expect to settle his total enrolled debt of $21,645.00 for between $15,716.00 and $17,370.00.

59. The agreement estimated that the Debt Resolution Agreement was Plaintiff's best option because Plaintiff would pay less when compared to the amounts that Plaintiff would pay if he opted instead for credit counseling with an estimated payoff of $27,056.00 or debt consolidation with an estimated payoff of $28,139.00 or by making minimum payments with an estimated payoff of $60,216.00.

60. Plaintiff entered the agreement based exclusively on Freedom's representations that it could help Plaintiff resolve his debt more quickly and for less money than other viable alternatives and it would be better for his credit score.

61. Per the agreement, Plaintiff was to cease making credit payments and instead claim financial hardship and deposit $386.00 each month into Finxera's Special Purpose Account ("SPA").

62. On October 7, 2016, Plaintiff began transferring $386.00 per month from his checking account into Finxera's SPA.

63. Plaintiff made approximately twenty-five transfers of varying amounts into Finxera's account between October of 2016 and September of 2019 totaling $9,688.00.

64. During the course of the relationship with Defendants, Freedom pressured Plaintiff to increase his monthly payment to an amount contrary to the agreement.

65. Plaintiff increased his payments as instructed and paid that increased amount for several months.

**Fees**

66. Freedom calculates its primary fee based on the consumer's total enrolled debt. In Plaintiff's case the fee was 23% of the enrolled debt amount, no matter the settlement amount or percentage.

67. Freedom claims to collect its fees only when a debt is settled and the first structured settlement payment is made to a creditor from the consumer's "dedicated bank account" as Freedom calls it.

68. But the term "dedicated bank account" is misleading. The account is not a traditional checking or savings account that the consumer controls. It is a virtual account with Finxera. There is no branch location, no checks are issued, there is no debit card or even an app to send or withdraw money.

69. Finxera calls the dedicated bank account a Special Purpose Account ("SPA") and transfers are made from the consumer's checking account into the SPA.

70. Once the funds are in the SPA, Finxera, Freedom and NLLG have total control and access. There is no right to a "charge back" or claim of fraud like a normal bank. The consumer has no power to reverse fraudulent or unlawful transactions.

71. Finxera charges a monthly service fee, initially $7.25, now $9.95, to maintain the SPA. Upon information and belief, part of this fee goes to Freedom or Housser in one form or another.

72. From the beginning, NLLG began charging Plaintiff $12.00 per month and taking the fee from the SPA, even though it was not authorized to do so.  The fees is nowhere to be found in the Debt Resolution Agreement.  Upon information and belief, Freedom or Housser receive part of this fee in some way.

73. Freedom rarely settles debts for lump sum payments.  It almost always insists on a structured settlement with monthly payments.  Plaintiff believes this is so Defendants can extract as many monthly fees as possible for as long as they can.

74. Once a creditor agrees to Freedom's payment plan, Freedom immediately pays itself first from the SPA.   Freedom claims it is entitled to 23% of the original debt, in full, at that point.

75. Seldomly do the consumers have that much money in their SPA, so freedom unilaterally decides how much to take.  But it is sure to leave enough funds in the SPA to pay NLLG $12.00 a month and Finxera $9.95 a month.

76. Often, Freedom's fee takes the SPA balance so low that scheduled settlement payments cannot be made causing a breach of the settlement agreement.

77. On March 27, 2017, Freedom settled Plaintiff's Capital One ("Cap One") account ending 1951 with a balance of $10,997.01 for $5,498.51.

78. Under the terms of the structured settlement, $17.51 was due to Cap One on April 21, 2017 and $189.00 every month thereafter until September 21, 2021.

79. The original amount on Exhibit A of the Debt Resolution Agreement was $9,773.00.

80. Freedom's fee was 23% of $9,773.00 or $2,247.79 which became due immediately from the SPA.

81. But on April 6, 2017, the balance in Plaintiff's SPA was only $1,356.19.

82. Under the Telemarketing Sales Rule, 16 C.F.R. § 310.4(a)(5)(i) and Plaintiff's Debt Resolution Agreement with Defendants, Freedom was not to take any

fees from Plaintiff's SPA until it had made at least one payment toward the Cap One settlement.

83. However, on April 20, 2017, before making a payment to Cap One, Freedom took $1,237.00 as part of its $2,247.79 fee. It is not known how Freedom determined that amount to be appropriate. The balance became $119.19.

84. On April 21, 2017, Freedom paid Cap One the first payment of $17.51 from Plaintiff's SPA. It charged Plaintiff $3.00 to do this because Freedom paid by Cap One by phone without Plaintiff's knowledge or consent, and the SPA balance became $98.68.

85. Freedom never made another payment to Cap One claiming the funds in the SPA were too low.

86. On May 18, 2017, Freedom took $50.00 from Plaintiff's SPA as partial payment for its Cap One settlement fee.

87. On June 20, 2017, Freedom took another $75.00 as partial payment for the fee.

88. All the while, NLLG and Finxera continued taking monthly fees as well, part of which Plaintiff asserts went to Freedom and Housser in one form or another.

89. On June 20, 2017, the balance in the SPA was $321.18. Freedom could have paid Cap One the $189.00 monthly settlement payment, but it did not because the SPA funds were allegedly too low.

90. To this day, Freedom has never explained to Plaintiff how it determined the fee amounts it took from Plaintiff's SPA or the dates of extraction.

91. On approximately twenty-five occasions Plaintiff was charged a "Monthly Service Fee."

92. The fee was $7.25, now $9.95, per month in direct violation law and the agreement because the funds were taken out prior to services being fully performed.

93. Plaintiff was charged $12.00 per month for the entirety of the program for NLLG's "legal services". This fee was not approved by Plaintiff and even when the services were needed, they were not provided resulting in a judgment against Plaintiff.

94. Plaintiff was charged $25.00 repeatedly for "Non Sufficient Funds Fees" resulting from a scheduled transfer from Plaintiff's checking account to his Special Purpose Account not going through. Yet both accounts belonged to Plaintiff.

95. Under Cal. Civ. Code § 1719(a)(1), "any person who passes a check on insufficient funds shall be liable to the payee." Here, there was no check and the payee was Plaintiff, not Freedom or Finxera.

96. Freedom often demanded payments from Plaintiff and used the funds to pay "Phone Payment" fees of $3.00 to itself.

97. The phone payments were regularly made to various creditors by Freedom on Plaintiff's behalf resulting in numerous $3.00 fees for Freedom or Finxera.

98. These fees went to Defendants, not Plaintiff's creditors and Defendants had an incentive to make many payments by phone.

99. The Debt Resolution Agreement does reference "Phone Payment" without any clarification. It implies Plaintiff would have a choice to incur the fee. Not that Defendants could pay by phone and charge the fee whenever wanted.

100. These "Phone Payment" fees were incurred between 2016 through 2017.

101. At no time did Defendants inform Plaintiff that this fee would occur regularly or at all without Plaintiff's consent, and at no time did Plaintiff agree to this type of phone fee.

102. At no time did Plaintiff authorize Defendants to incur these fees for themselves.

103. At no time relevant did Defendants discuss any payment alternatives that could be explored which would not result in a "Phone Payment" fee.

104. Freedom illegally and constantly took unauthorized "Settlement Fees" from Plaintiff's SPA.

105. Freedom advised Plaintiff that as a part of its business practice, it first takes its own fees, and then uses the remaining funds to make settlement payments.

106. The settlement fees were taken from Plaintiff's SPA prior to the completion of Freedom's services and prior to the first settlement payment being made.

107. Between April 20, 2017, and November 9, 2019, Freedom extracted "Settlement Fees" from Plaintiff's SPA on numerous occasions.

108. The unauthorized withdrawals for "Settlement Fees" varied from $50.00 to $1,237.00.  Plaintiff never knew how much Freedom would take, or when, or for which settlement.

109. Plaintiff was never provided a fee schedule or any sort of document outlining how, when, or what amount in "Settlement Fees" would be withdrawn from Plaintiff's account.

110. The "Settlement Fees" do not correspond with accounts that were settled.  It is impossible for Plaintiff to ascertain which fees are for which settlements.

111. Plaintiff never consented to the haphazard, unclear, confusing and convoluted form of withdrawal of "Settlement Fees".

**NLLG Fees & Missed Deadline**

112. From the beginning of the relationship in October of 2016, NLLG began taking $12.00 a month from Plaintiff's SPA without authorization, consent or approval by Plaintiff.  The fee is not in the Debt Resolution Agreement. Plaintiff never agreed to pay NLLG and did not need NLLG's service at the time.

113. On May 1, 2018, a lawsuit was filed against Plaintiff related to one of his debts in Defendants' program known as Prosper Marketplace which had been transferred to Absolute Resolutions Investments, LLC ("Absolute").  The lawsuit is Absolute Resolutions Investments, LLC vs Aganon filed in San

Diego Superior Court on May 1, 2018 under case number 37-2018-00021591-CL-CL-CTL.

114. On June 5, 2018, Plaintiff was served the lawsuit and immediately emailed Freedom about it and faxed the Summons and Complaint to NLLG as instructed by Freedom.

115. Despite charging Plaintiff $12.00 per month for almost two years, NLLG completely failed to respond to the lawsuit. NLLG did not contact Absolute's attorney or file an answer or otherwise appear in the lawsuit, unknown to Plaintiff.

116. On May 30, 2019, Absolute obtained a default judgment against Plaintiff for $6,745.45.

117. On October 18, 2019, a writ was issued and Plaintiff now lives in fear of bank levies and wage garnishments.

118. Plaintiff trusted and paid Defendants to handle his debt and the lawsuit. He relied on Defendants and believed he was in good hands.

**Freedom Refusing to Provide Plaintiff His Debt Resolution Agreement or Allow Him to Withdraw from The Program or Release His Funds & Defendants' Other Unlawful Business Practices**

119. In 2016, when Plaintiff signed up with Defendants, Freedom sent Plaintiff his Debt Resolution Agreement ("DRA") to sign electronically via DocuSign and no paper version was provided to Plaintiff.

120. Freedom claimed the DRA and all other related documents would be available to Plaintiff on Freedom's website called the "Dash Board".

121. But the DRA was no-where to be found on Plaintiff's Dash Board or any other part of the website.

122. On September 27, 2019, Plaintiff requested his DRA from Freedom in writing via e-mail.

123. On September 30, 2019, Freedom's agent responded saying it would send the

DRA in "three to four business days".

124. In the following weeks, Plaintiff requested the DRA from Freedom at least three more times in writing only to encounter more delay tactics.

125. On October 18, 2019, three weeks after Plaintiff requested it, Freedom finally emailed Plaintiff his DRA.

126. On November 1, 2019, Plaintiff informed Defendant that he was withdrawing from the program and asked for an accounting and for a return of the funds in his SPA.

127. On November 1, 2019, Freedom responded with an email advising Plaintiff he had to call them to withdraw from the program.

128. On November 4, 2019, Plaintiff again requested in writing to withdraw from the program and have his SPA funds sent to him.

129. On November 5, 2019, Freedom again responded via email telling Plaintiff he had to call them to withdraw and to access his SPA funds.

130. On November 6, 2019, after Defendant refused to allow Plaintiff to withdraw or access his SPA funds, Plaintiff was forced to call Freedom.

131. During the ensuing twenty-minute conversation, Plaintiff's call was elevated to a retention specialist that attempted every sales trick in the book to prevent Plaintiff from withdrawing.

132. The agent even said "you've already paid us a fee for doing something that didn't get completed" and "this is gonna cost you money".

133. On October 30, 2019, the balance in Plaintiff's SPA was $4,720.99.

134. On November 9, 2019, after Freedom, NLLG and Finxera took alleged fees they say they were owed the final balance became $4,255.06.

135. Defendants justified this by stating the withdrawals were required to cover fees.

136. Plaintiff at no time consented to the withdrawals and the withdrawals were wholly unauthorized and unlawful.

137. Defendants caused Plaintiff damages including but not limited to, lost money and property, deprivation of use of the account at issue, lost funds which were unlawfully taken from said account that have yet to be returned, inconvenience, and emotional distress.

### Housser's Substantial Involvement

138. Housser has had the authority and responsibility to approve Freedom's policies and practices.

139. Housser has had the authority and responsibility to approve the content of the Debt Resolution Agreements.

140. Housser's name and signature have appeared on all Debt Resolution Agreements with consumers and Plaintiff.

141. Housser has known that the statement included in Plaintiff's Debt Resolution Agreement, Section Two, that "each Creditor listed on Exhibit A will work with us to negotiate a settlement of your Debts" was not true with respect to Plaintiff's creditor Synchrony Bank.  Housser has known that Synchrony Bank had policies against negotiating with debt-settlement companies. Housser has known that Freedom would be unable to negotiate with Synchrony Bank who had such policy.

142. Housser has known that the statement included in all Debt Resolution Agreements that consumers would only be charged if Freedom negotiated a settlement and consumers made payments toward those settlements was not true.

143. Housser has had knowledge of and control over Freedom's fee-charging practices, including its charging of fees in the absence of any consumer payment on a settlement as well as a myriad of other fees.

### CROAA

144. Through this conduct, Defendants violated 15 U.S.C. § 1679b(a)(3) by making an untrue or misleading representation regarding its credit repair and

debt settlement services.

145. Through this conduct, Defendants violated 15 U.S.C. § 1679b(a)(4) by engaging directly or indirectly in any act, practice, or course of business that constitutes or results in the commission or attempt to commit a fraud or deception on a person in connection with the sale of Defendants' credit repair and debt settlement services.

146. Through this conduct, Defendants violated 15 U.S.C. § 1679b(b) by charging or receiving payment in advance for the performance of services Defendants had agreed to perform for Plaintiff before the service was fully performed.

**BPC**

147. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq.* and engaged in business practices that are unlawful because they violate the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* In addition, Defendants violated the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. 1693, *et seq.*, by conducting transfers of Plaintiff's funds without consent or authorization.

148. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq.* and engaged in business practices that are unfair because Defendants did not fully disclose material information regarding the program to Plaintiff and pressured Plaintiff to agree to additional services for additional fees.

149. As a result of the unfair business practices, Defendants gain a competitive advantage over competitors who comply with the CROA and Bus. & Prof. Code § 17200, thereby receiving more money from, and causing injury to, unsuspecting consumers.

150. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous,

and against public policy, the utility of such conduct, if any, being far outweighed by the harm done to consumers.

151. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq*. and engaged in business practices that are deceptive.

152. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendants engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200, *et seq*., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200, *et seq*.

153. Defendants' conduct is likely to deceive the public who are likely to believe that Defendants may contractually charge a retainer fee, service fee, or pressure consumers to increase their monthly deposits into their dedicated bank accounts, even though those fees exceed those permitted by contract or law.

154. Moreover, Defendants misrepresent to Plaintiff and the general public that the sales representatives are unbiased "Certified Debt Consultants" when these individuals hold no specialized certifications and actively promote Defendants' program over other debt relief options, such as credit counseling or debt consolidation.

155. As a result of each and every violation of the UCL, Plaintiff is entitled to damages pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*. as a result of Defendants' unlawful, unfair, and deceptive business practices. Defendants are liable to make restitution of such charges, including interest on the liquidated sum from the date of payment plus interest.

156. Defendants' advertising is unfair, deceptive, untrue or misleading in that consumers are led to believe that they are working with certified debt consultants when those individuals are merely Defendants' sales

representatives.

157. Consumers are further misled into believing that Defendants' program will result in a net benefit to their credit score, report, or rating as long as they fully participate and make the scheduled deposits as calculated by Defendants. However, Defendants do not inform clients that sufficient funds do not accumulate in the dedicated bank account for approximately 6-9 months from the date of enrollment.

158. Defendant also does not inform clients that if they fail to deposit what is considered "sufficient funds" into the account they will be subject to a fee.

159. Plaintiff, reasonable consumers, and the public would likely be, and, in fact were, deceived and misled by Defendants' advertising that participating in its program for the duration calculated by Defendants would reduce Plaintiff's debt and improve Plaintiff's long-term credit score, credit report, or credit rating.

160. Defendants' unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue or misleading advertising present a continuing threat to the public because Defendants continue to engage in unlawful, unfair, and deceptive conduct that harms consumers.

161. Defendants engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendants' self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff, thereby unjustly enriching Defendants.

162. Such acts and omissions by Defendants are unlawful and/or unfair and/or fraudulent and constitute violations of Business & Professions Code section 17200, *et seq*.

163. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendants received and continue to receive an unfair competitive advantage and unearned commercial benefits

at the expense of its competitors and the public.

164. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq.* by engaging in business practices that are unlawful, unfair, or fraudulent.

165. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct described herein, Defendants have been and will continue to be unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendants' misleading representations.

166. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' false representations regarding Defendants' services.

**EFTA**

167. The "dedicated bank account" or Special Purpose Account ("SPA") referenced herein and Plaintiff's other checking account implicated by Defendants' conduct are each "accounts" as defined by 15 U.S.C. 1693a(2) and 12 C.F.R. 1005.2(b)(1).

168. Defendant withdrew funds from Plaintiff's account, without Plaintiff's authorization and not in compliance with the agreement.

169. Defendants transferred themselves funds from Plaintiff's SPA under the guise of "Phone Payment Fees", "Non Sufficient Funds Fees", "Monthly Service Fees", "NLLG Monthly Service Fees" and "Settlement Fees".

170. Each unauthorized withdrawal described herein of Plaintiff's funds constitutes an "unauthorized electronic fund transfer" as defined by 15 U.S.C. 1693a(12) and 12 C.F.R. 1005.2(m).

171. Through this conduct, Defendants violated 15 U.S.C. 1693e(a) as Defendants executed unauthorized electronic fund transfers from Plaintiff's account.

///

///

**RFDCPA**

172. Through this conduct, Defendants violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress and abuse Plaintiff in connection with the collection of the alleged debt.  This section is also incorporated into the RFDCPA through Cal. Civ. Code § 1788.17; thus, Defendants also violated Cal. Civ. Code § 1788.17.

173. Through this conduct, Defendants violated 15 U.S.C. § 1692e by using false, deceptive and misleading representations in connection with the collection of the alleged debt.  This section is incorporated into the RFDCPA through Cal. Civ. Code § 1788.17; thus, Defendant also violated Cal. Civ. Code § 1788.17.

174. Through this conduct, Defendants violated 15 U.S.C. § 1692e(2)(B) by making a false or misleading representation in regard to any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt. This section is incorporated into the Rosenthal Act through Cal. Civ. Code § 1788.17. Thus, Defendants violated Cal. Civ. Code § 1788.17.

175. Through this conduct, Defendants violated 15 U.S.C. § 1692e(10) by using false representations and deceptive means in attempting to collect the alleged debt from Plaintiff. This section is incorporated into the Rosenthal Act through Cal. Civ. Code § 1788.17.  Thus, Defendants violated Cal. Civ. Code § 1788.17.

176. Through this conduct, Defendants violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect Plaintiff's alleged debt. This section is incorporated into the Rosenthal Act through Cal. Civ. Code § 1788.17.  Thus, Defendants violated Cal. Civ. Code § 1788.17.

177. Through this conduct, Defendants violated 15 U.S.C. § 1692f(1) by collecting funds from Plaintiff that were not authorized by any agreement creating the

debt. This section is incorporated into the Rosenthal Act through Cal. Civ.

Code § 1788.17.  Thus, Defendants violated Cal. Civ. Code § 1788.17.

## CAUSES OF ACTION
## COUNT I
### VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT
### 15 U.S.C. §§ 1679, *ET SEQ.* (CROA) AS TO FREEDOM & HOUSSER

178. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

179. The foregoing acts and omissions constitute numerous and multiple violations of the CROA.

180. Freedom is a CRO because it counsels and advises consumers of the benefits and drawbacks of different types of credit repair services and then instructs consumers to take a course of action – to cease making credit payments – which will alter the consumer's credit rating, credit history, or credit score.

181. Moreover, Freedom convinces consumers to enroll in its program based on the misleading representation that its program is superior to other services, despite the immediate negative credit implications, because consumers will be able to reduce their debt load, ultimately resulting in improvement of their credit worthiness.

182. As a result of each and every violation of the CROA, Plaintiff request actual damages, punitive damages, and attorney's fees pursuant to 15 U.S.C. § 1679g.

## COUNT II
### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
### BUS. & PROF. CODE § 17200, *ET SEQ.* (UCL) AS TO ALL DEFENDANTS

183. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

184. The foregoing acts and omissions constitute numerous and multiple violations of the California's Unfair Competition Law ("UCL").

185. "Unfair competition" is defined by Business and Professions Code Section §

17200 as encompassing several types of business "wrongs," including: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."  The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

186. By and through Defendants' conduct alleged herein, Defendants engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices, and unfair, deceptive, untrue or misleading advertising prohibited by Bus. & Prof. Code § 17200, *et seq.*.

**Unlawful**

187. Beginning at a date currently unknown through the time of the filing of this Complaint, Defendants have committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code § 17200, *et seq.*.

188. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq.* and engaged in business practices that are unlawful because they violate the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* In addition, Defendants violated the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. 1693, *et seq.*, by conducting transfers of Plaintiff's funds without consent or authorization.

**Unfair**

189. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendants have committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200, *et seq.*.

190. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq.* and engaged in business practices that are unfair because Defendant did not fully disclose material information regarding

its program to Plaintiff and pressured Plaintiff to agree to additional services for additional fees.

191. As a result of its unfair business practices, Defendants gained a competitive advantage over competitors who comply with the CROA and Bus. & Prof. Code § 17200, thereby receiving more money from, and causing injury to, unsuspecting consumers.

192. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, and against public policy, the utility of such conduct, if any, being far outweighed by the harm done to consumers.

**Fraudulent**

193. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendants engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200, *et seq*., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200, *et seq*..

194. Defendants' conduct is likely to deceive members of the public who are likely to believe that Defendants may contractually charge a retainer fee, service fee, or pressure consumers to increase their monthly deposit into their dedicated bank accounts, even though the fees exceed that permitted by contract or law.

195. Moreover, Defendants misrepresents to the general public that their sales representatives are "Certified Debt Consultants" when these individuals hold no specialized certifications and actively promote Defendants' program over other debt relief options, such as credit counseling or debt consolidation.

196. As a result of each and every violation of the UCL, Plaintiff is entitled to damages pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*. as a result of Defendants' unlawful, unfair, and deceptive business practices. Defendants

are liable to make restitution of such charges, including interest on the liquidated sum from the date of payment plus interest.

### Unfair, Deceptive, Untrue, or Misleading Advertising

197. Defendants' advertising is unfair, deceptive, untrue or misleading in that consumers are led to believe that they are working with certified debt consultants when those individuals are merely Defendants' sales representatives.

198. Consumers are further misled into believing that Defendants' program will result in a net benefit to their credit score, report, or rating as long as they fully participate and make the scheduled deposits as calculated by Defendants. However, Defendants do not inform clients that sufficient funds do not accumulate in the dedicated bank account for approximately six to nine months from the date of enrollment or more.

199. Plaintiff, reasonable consumers, and the public would likely be, and, in fact were, deceived and misled by Defendants' advertising that participating in its program for the duration calculated by Defendants would reduce Plaintiff's debt and improve Plaintiff's long-term credit scores, credit reports, or credit ratings.

200. Defendants' unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue or misleading advertising present a continuing threat to the public because Defendants continue to engage in unlawful, unfair, and deceptive conduct that harms consumers.

201. Defendants engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendants' self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff; thereby unjustly enriching Defendants.

202. Such acts and omissions by Defendants are unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code section

17200, *et seq.*

203. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendants received and continue to receive an unfair competitive advantage and unearned commercial benefits at the expense of its competitors and the public.

204. Through this conduct, Defendants violated California Business and Professions Code § 17200, *et seq.* by engaging in business practices that are unlawful, unfair, or fraudulent.

205. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct described herein, Defendants have been and will continue to be unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendants based on Defendants' misleading representations.

206. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' false representations set forth by Defendants.

**COUNT III**
**VIOLATIONS OF ELECTRONIC FUNDS TRANSFER ACT**
**15 U.S.C. §§ 1693, ET SEQ. (EFTA) AS TO ALL DEFENDANTS**

207. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

208. The foregoing acts and omissions constitute numerous and multiple violations of EFTA.

209. As a result of each and every violation of the EFTA, Plaintiff is entitled to any actual damages pursuant to 15 U.S.C. § 1693m(a)(1); statutory damages in an amount not less than $100 nor greater than $1,000.00 pursuant to 15 U.S.C. § 1693m(a)(2)(A); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1693m(a)(3) from Defendants.

///

///

## COUNT IV

### VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT CAL. CIV. CODE §§ 1788-1788.32 (RFDCPA) AS TO ALL DEFENDANTS

210. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

211. The foregoing acts and omissions constitute numerous and multiple violations of the RFDCPA.

212. As a result of each and every violation of the RFDCPA, Plaintiff is entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a); statutory damages for a knowing or willful violation in the amount up to $1,000.00 pursuant to Cal. Civ. Code § 1788.30(b); and reasonable attorney's fees and costs pursuant to Cal. Civ. Code § 1788.30(c) from each Defendant individually.

## COUNT V

### NEGLIGENT MISREPRESENTATION AS TO ALL DEFENDANTS

213. Plaintiff incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

214. Plaintiff is informed and believes, and thereon alleges, that at all relevant times, Defendants made representations to Plaintiff that misrepresented the quality of the services offered and benefits that would be realized by Plaintiff.

215. Defendants, at all times relevant, had a pecuniary interest in the transactions.

216. Plaintiff is informed and believes, and thereon alleges, that at all times relevant, Defendants did not exercise reasonable care or competence in obtaining or communicating the information regarding the services offered by Defendants.

///

///

///

## COUNT VI

### INTENTIONAL MISREPRESENTATION AS TO ALL DEFENDANTS

217. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

218. Plaintiff is informed and believes, and thereon alleges, that Defendants intentionally and willfully misrepresented quality of the services offered and benefits that would be realized by Plaintiff.

219. Said representations were material misrepresentations.

220. Plaintiff is informed and believes, and thereon alleges, that at all relevant times, Defendants made the false representations to Plaintiff with full knowledge of the falsity.

221. Plaintiff entered into a contract with Defendants based solely on the representations made by Defendants. Therefore, Plaintiff is informed and believes and thereon alleges, that at all relevant times Defendants intended that Plaintiff rely on the representations made by Defendants.

222. Plaintiff did in fact rely on the misrepresentations by Defendants causing Plaintiff harm.

## COUNT VII

### NEGLIGENCE AS TO ALL DEFENDANTS

223. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

224. Plaintiff believes and thereon alleges that Defendants owed various duties to Plaintiff pursuant to CROA; Cal. Bus. And Prof. Code § 17200, *et seq.*; EFTA; and the RFDCPA. Specifically, Defendants owed a duty to Plaintiff with regard to the manner in which Defendants operate.

225. Defendants breached Defendants' duties by engaging in the acts described herein each in violation of the CROA; Cal. Bus. And Prof. Code § 17200, *et*

*seq.*; EFTA; and the RFDCPA.

226. Plaintiff asserts that Defendants are the actual and legal cause of Plaintiff's injuries.

227. Plaintiff believes and thereon alleges that as a proximate result of Defendants' negligence, Plaintiff has suffered severe emotional distress.

228. Due to the egregious violations alleged herein, Plaintiff asserts that Defendants breached Defendants' duties in an oppressive, malicious, despicable, gross and wantonly negligent manner. As such, said conduct establishes Defendants' conscious disregard for Plaintiff's rights and entitles Plaintiff to recover punitive damages from Defendants.

## COUNT VIII

### CONVERSION AS TO ALL DEFENDANTS

229. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

230. Defendants intentionally took monies from Plaintiff's account.

231. At all times, Plaintiff owned and/or had full possessory rights over the funds in Plaintiff's account.

232. At all times, Defendants had no possessory right to the funds in Plaintiff's account.

233. Defendants were to use the money in the account only as expressly authorized by Plaintiff.

234. Defendants prevented Plaintiff from having access to and fully deprived Plaintiff of any possessory rights or enjoyment of his monies described above.

235. The conduct of Defendants was oppressive, fraudulent, malicious and outrageous.

236. Defendants harmed Plaintiff by fully depriving Plaintiff of the full use, value and enjoyment of the monies described above.

237. Defendants further caused Plaintiff to suffer emotional distress.

*///*

238. The conduct of Defendants was a substantial factor in causing Plaintiff this emotional distress and the harm described above in an amount to be proven at trial.

239. Plaintiff is entitled to punitive and exemplary damages in an amount to be established at trial.

## COUNT IX

## TRESPASS TO CHATTELS AS TO ALL DEFENDANTS

240. Plaintiff incorporates by reference, all of the above paragraphs of this Complaint as though fully stated herein.

241. Plaintiff had a right to possession of his account and monies contained therein at the time Defendants unlawfully took possession.

242. Defendants have intentionally and substantially interfered with Plaintiff's property by taking and retaining possession of Plaintiff's property, preventing Plaintiff from having access to said account and monies.

243. Plaintiff did not consent to Defendants' conduct.

244. Defendants' conduct has caused Plaintiff damages including but not limited to, lost work, deprivation of use of the money at issue, lost funds which were taken from said account that have yet to be returned, inconvenience, and emotional distress.

245. As a result of Defendants' conduct, Plaintiff is entitled to actual damages, including economic and non-economic damages, and punitive damages.

## TRIAL BY JURY

Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants for:

- General damages according to proof;

- Special damages according to proof;

- Costs of suit incurred herein;

- As a result of each and every violation of the CROA, an award of actual damages, the greater of (1) the amount of any actual damages sustained by Plaintiff or (2) any amount paid by Plaintiff to Defendants pursuant to 15 U.S.C. § 1679g(a)(1)(A)-(B);

- An award of punitive damages, in such amount as the court may allow, pursuant to 15 U.S.C. § 1679g(a)(2)(A);

- An award of costs of litigation and reasonable attorney's fees, pursuant to 15 U.S.C. § 1679g(a)(3).

- An award of actual damages, in an amount to be determined at trial, pursuant to Cal. Bus. & Prof. Code § 17206(b), for Plaintiff;

- That Defendants be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;

- An award of costs of litigation and reasonable attorney's fees, pursuant to Cal. Civ. Code § 1788.30(c) and Cal. Civ. Code § 1021.5 for Plaintiff;

- An award of actual damages, in an amount to be determined at trial, pursuant to 15 U.S.C. § 1693m(a)(1) and 15 U.S.C. 1693m(a)(2)(A), against Defendants;

- An award of costs of litigation and reasonable attorney's fees, pursuant to 15 U.S.C. § 1693m(a)(3);

- An award of actual damages, in an amount to be determined at trial, pursuant to Cal. Civ. Code § 1788.30(a), for Plaintiff;

- An award of statutory damages of $1,000.00, pursuant to Cal. Civ. Code § 1788.30(b), for Plaintiff;

- An award of costs of litigation and reasonable attorney's fees, pursuant to Cal. Civ. Code § 1788.30(c) for Plaintiff;

///

- Punitive damages according to proof against Defendants; and,
- Any and all other relief the Court deems just and proper.

Date:  December 11, 2019                    SWIGART LAW GROUP, APC

                                            By:  *s/ Joshua B. Swigart*
                                            Joshua B. Swigart, Esq.
                                            Josh@SwigartLawGroup.com

                                            Attorney for Plaintiff